In re Magic Marker Securities Litigation, J. L. WOLGIN, Sidney Kampel, Sophie Sherman, Joseph Altchek, Eleanor Altchek, Maurice M. Charney, Hanna K. Charney and Arthur A. Litt, on behalf of themselves and all others similarly situated,

v.

MAGIC MARKER CORPORATION, Albert Fried & Company, Amherst Securities Corporation, Bache, Halsey, Stuart, Inc., Casa Bella Imports, Inc., Delphi Capital Corporation, First Alabama Securities, Inc., Harris, Upham & Co., H. Hentz & Company, Inc., Hornblower & Weeks-Hemphill, Noyes, Incorporated, Import Centers, Inc., Loeb Rhoads, Hornblower & Co., S. D. Lunt & Co., Shearson, Hammill & Co., Inc., Shearson, Hayden Stone, Inc., Shields & Company, Shields, Model, Roland & Co., Inc., Smith, Barney, Harris, Upham & Company, Arnold Bernhard & Co., Inc., W. Eric Aiken, Harvey Birdman, Charles Birkholz, Herrold Bloom, Yiddy Bloom, Bernard Cronin, Joseph DeLoge, Burton Dubbin, Myron Freeman (a/k/a "Mickey"), Ira Ingerman, Harvey Klebanoff (a/k/a "Harvey Kaye"), Robert Knoth, Stanley Levin, Albert London, Joseph Patrick, Michael Rekoon, Lawrence Richter, Abraham Salaman, Jack Silbiger, John Tees and Jay Teitelbaum.

Civ. A. No. 77–3155.

United States District Court, E. D. Pennsylvania.

April 9, 1979.

David Berger, Sherrie R. Savett, Gary E. Cantor, Philadelphia, Pa., Lead and Liaison Counsel for all plaintiffs; Leonard Barrack, Gerald J. Rodos, Philadelphia, Pa., for plaintiffs.

Peter S. Greenberg, Philadelphia, Pa., Lead and Liaison Counsel for all defendants.

## OPINION

LUONGO, District Judge.

Plaintiffs in this securities fraud case are investors who purchased Magic Marker Corporation common stock during a period of alleged price manipulation. In their second consolidated amended complaint, plaintiffs allege that over a period of nearly two years, some forty individual and corporate defendants took part in a wide-ranging conspiracy to artificially inflate the price of Magic Marker stock. Plaintiffs assert claims for damages under sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t (1976), the rules and regulations issued thereunder by the Securities and Exchange Commission, sections 15 and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77o, 77q(a) (1976), and Pennsylvania law. Jurisdiction is based on 15 U.S.C. §§ 77v, 78aa (1976), 28 U.S.C. §§ 1331, 1337 (1976), and the doctrine of pendent jurisdiction. Presently before me are plaintiffs' amended motion for class action certification and defendants' motion to dismiss the complaint for failure to state a claim upon which relief may be granted. For the reasons hereafter stated, I conclude that plaintiffs' motion for class action certification should be granted, and that defendants' motion to dismiss the complaint should be denied.

Plaintiffs devote twenty-seven pages of their second consolidated amended complaint to detailed factual allegations regarding defendants' conspiratorial activities. A brief synopsis of those allegations will suffice for present purposes.

In general, plaintiffs allege that defendants conspired to create the appearance of active public trading in Magic Marker Corporation common stock, thereby stimulating public demand and raising the price of such stock. Defendants allegedly reduced the "active float" (the volume of shares actually available for public trading) by directly or indirectly tying up large blocks of shares in accounts that they controlled. This served to heighten the impact of each subsequent purchase on the market price of the remaining shares. It also helped to further the impression of active public trading in the stock. Defendants allegedly placed orders each day on the National Stock Exchange for sufficient shares to insure that the closing price of Magic Marker Corporation common stock that day would be no less than its closing price on the preceding days. To generate further public demand for the stock, defendants allegedly paid a market analyst to write a highly favorable (but false) report for Value Line on the desirability of the stock. Moreover, none of these activities were disclosed to investors. As a result of these activities, defendants were able to sell large blocks of shares at prices far in excess of the trading price that had prevailed during the year prior to the initiation of this conspiracy. When defendants sold their shares at these inflated prices, of course, other investors, including the named plaintiffs, purchased them at those prices. When the conspiracy ended, and the forces of the market were again permitted to set the value of Magic Marker stock, the prices of those investors' holdings declined.

Based on the foregoing allegations, plaintiffs assert claims under the federal securities laws (Count I) and under state law (Count II). With respect to Count I, plaintiffs focus primarily on clauses (a) and (c) of Rule 10b–5, 17 C.F.R. § 240.10b–5 (1978). Those clauses prohibit "any device, scheme, or artifice to defraud," and "any act, practice, or course of business which operates . . . as a fraud or deceit upon any person, in connection with the purchase or sale of any security." With respect to Count II, plaintiffs simply allege that the complained-of acts and omissions "were willful or reckless and constitute fraud and other violations of state law." Second Consolidated Amended Complaint (Document No. 169) ¶ 77.

## AMENDED MOTION FOR CLASS ACTION CERTIFICATION

■ Plaintiffs seek to maintain this action as a class action under Rule 23(b)(3). The proposed class consists of

"all record owners who purchased securities of Magic Marker Corporation between November 1, 1971, through July 31, 1973, excluding therefrom defendant brokerage houses herein insofar as they purchased such securities for their own beneficial accounts (conversely, not excluding defendant brokerage houses herein insofar as they purchased such securities for the accounts of others), the other defendants herein, members of the immediate family of each of the individual defendants, any other entity in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the defendants."

Plaintiffs' Amended Motion (Document No. 170) at 1. I find that the proposed class action satisfies the four prerequisites of Rule 23(a), as well as the two requirements of Rule 23(b)(3), and that plaintiffs' motion should therefore be granted.

### Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Although plaintiffs have offered no direct estimate of class size, they have submitted information regarding stock transfers during the class period, and this information enables me to make an (admittedly indirect) estimate of class size. First plaintiffs have presented portions of the ISL Daily Stock Price Index, and this material reveals that more than 6,000,000 shares of Magic Marker Corporation common stock were traded between November 1, 1971 (the

beginning of the class period) and December 31, 1972 (the end of the class period as originally defined). The class period given in plaintiffs' amended motion runs through July 31, 1973, however, so that the trading volume during the class period undoubtedly exceeded 6,000,000 shares. Second, plaintiffs have submitted affidavits bearing on the number of transactions that occurred during the class period, and these materials indicate that over 11,000 separate transactions in Magic Marker Corporation securities took place between November 1, 1971 and July 31, 1973. Taken together, the volume of shares traded and the number of separate transactions certainly suggest that the proposed class satisfies the numerosity requirement.

Defendants resist this approach, which they claim is "based on pure speculation." Defendants' Memorandum in Opposition (Document No. 203) at 14. They also suggest that plaintiffs' approach is fallacious in view of the specific facts alleged here. Neither argument is persuasive.

First of all, I see no reason why would-be class representatives may not satisfy Rule 23(a)(1) by making an indirect showing as to numerosity. In securities actions, the "federal trial courts are quite willing to accept common sense assumptions in order to support a finding of numerosity." 5 Newberg on Class Actions § 8812 at 836 (1977); see, e.g., Brady v. LAC, Inc., 72 F.R.D. 22, 26–27 (S.D.N.Y.1976); Hawk Indus., Inc. v. Bausch & Lomb, Inc., 59 F.R.D. 619, 623 (S.D.N.Y.1973). Defendants point to the stern language in Demarco v. Edens, 390 F.2d 836, 845 (2d Cir. 1968) (would-be representative "must make a positive showing" as to numerosity), but that decision clearly "represents the minority view." 5 Newberg on Class Actions § 8812 at 838 (1977). Even in the Second Circuit, Demarco v. Edens has not been read to bar the type of showing made here. See, e.g., Brady v. LAC, Inc., supra; Hawk Indus., Inc. v. Bausch & Lomb, Inc., supra.

Secondly, I cannot agree that the specific allegations made in this case vitiate plaintiffs' indirect approach to numerosity. The complaint plainly alleges extensive trading during the class period by the defendants. Because defendants are by definition excluded from class membership, they urge that plaintiffs may not use the volume of shares traded (or the number of transactions) as an accurate gauge of class size, for much of this trading was (allegedly) carried out by defendants. But even if defendants were responsible for a great many of the 11,000–plus transactions that occurred during the class period, that would undoubtedly leave at least several hundred persons, apart from defendants, who had traded and who are potential class members. A class of that size would certainly satisfy the numerosity requirement of Rule 23(a)(1).

Thus, I find at this time that plaintiffs have satisfied the numerosity requirement.

### Commonality

Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class." To quote from plaintiffs' brief:

> "Among the questions of law and fact common to the class are: (i) whether defendants' acts and transactions as alleged in the Complaint violated the federal securities law and the common law by concealing or misrepresenting material facts in order to manipulate the market for Magic Marker securities; (ii) whether the facts which were concealed or misrepresented by defendants were material; (iii) whether defendants acted knowingly or recklessly and in disregard of the rights of the class; (iv) whether plaintiffs and the class sustained damages; (v) what measure of damages would be applicable; and (vi) what additional modes of relief would be appropriate to redress the injuries sustained by class members."

Plaintiffs' Memorandum of Law (Document No. 40) at 23–24. Defendants nowhere suggest that plaintiffs have failed to meet the commonality requirement of Rule 23(a)(2), and I am fully satisfied that common questions are present here.

*Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Although the meaning of the typicality requirement is obscure, 3B Moore's Federal Practice ¶ 23.06–2 (2d ed. 1948), defendants insist that "no [named] plaintiff has a claim which is typical of the claims of all class members which plaintiffs purport to represent." Defendants' Memorandum in Opposition (Document No. 203) at 18. I disagree.

In my view, the proposed class action raises no serious typicality issues because plaintiffs' claims under the federal securities laws are virtually *identical* to the claims of the absent class members. Each named plaintiff and each absent class member seeks damages from all defendants for injuries sustained when they purchased Magic Marker stock at artificially inflated prices. Defendants, however, point out certain factual differences among the named plaintiffs, and draw from these differences the conclusion that each named plaintiff is "atypical." I shall consider briefly the principal objections raised by defendants.

First, defendants argue that plaintiff Sherman is "atypical" because the purchase confirmation slips produced by her attorneys reveal that she *sold* 1,000 shares of Magic Marker stock on March 20, 1972, at a price allegedly inflated by defendants' activities. In essence, defendants contend that the profit she realized from this sale should offset any losses that Sherman incurred when the conspiracy ended and her remaining holdings declined in value. If such an offset is proper, and if defendants' computations are accurate, Sherman would be unable to establish any monetary damages. But that has no bearing at all on whether her claim is typical of the absent class members' claims. Rule 23(a)(3) certainly does not require a would-be class representative to prove that she has sustained damages before a class may be certified. *E.g., Wellman v. Dickinson,* 79 F.R.D. 341, 345–46 (S.D.N.Y.1978); *Dorfman v. First Boston Corp.,* 62 F.R.D. 466,

472–73 (E.D.Pa.1974); *cf. Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (preliminary determination of the merits of plaintiffs' claims has no place in decision of a Rule 23 motion); *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir. 1970) (same).

Second, defendants argue that Joseph and Eleanor Altchek, who jointly purchased Magic Marker stock, are "atypical" because their decision to purchase the stock was influenced by unique oral representations made to them by defendant Teitelbaum in the offices of defendant Shearson. Thus, defendants contend, "the Altcheks have no interest in establishing either the claims of other purchasers of Magic Marker stock or the necessary elements or claims of other purchasers in the course of attempting to establish their own claim." Defendants' Memorandum in Opposition (Document No. 203) at 21. It does appear that the Altcheks *could* attempt to establish liability based on defendant Teitelbaum's oral representations, rather than basing their claim on the wide-ranging price manipulation alleged in the complaint. But the several memoranda filed in connection with this motion make it abundantly clear that the Altcheks have chosen the latter approach. Thus, their claim will stand or fall based on proof of the alleged conspiracy. Far from being atypical, the Altcheks' claim is identical to the claim raised by each of the absent class members.

Third, defendants contend that plaintiff Litt is "atypical" because he *sold* Magic Marker stock on five different dates during the class period. Insofar as defendants rely on the possibility that profits from those sales will offset Litt's damages, I have already determined (in connection with plaintiff Sherman) that typicality is not destroyed by that possibility. However, defendants also argue that, for Litt to maximize his recoverable damages, "his interest will lie in showing that any [price] inflation caused by the alleged manipulation was small or non-existent on these [five] dates." Defendants' Memorandum in Opposition (Document No. 203) at 22. The absent class

members, however, will seek to prove that the prices at which they purchased Magic Marker stock during the class period were substantially inflated. Thus, defendants conclude, Litt's interests are antagonistic to those of the class. I cannot agree.

■ It may well be that, should plaintiffs succeed in establishing classwide liability, Litt (and other class members who sold shares during the class period) will advocate a different measure of damages than will those class members who simply held their shares during the class period. In that event, it may become necessary to create subclasses under Rule 23(c)(4), to insure that "selling" and "non-selling" class members may utilize different approaches to the computation of damages. But the potential for differing approaches to damages hardly justifies the conclusion that Litt's claim is atypical. *See, e.g., Blackie v. Barrack*, 524 F.2d 891, 908–911 (9th Cir. 1975) (collecting authorities), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Simon v. Westinghouse Elec. Corp.*, 73 F.R.D. 480, 484 (E.D.Pa.1977).

Fourth, defendants argue that plaintiff Wolgin raises "still another uniquely atypical claim" because he purchased Magic Marker shares through one Nathan Alexander, a business associate, rather than through a brokerage firm. Defendants' Memorandum in Opposition (Document No. 203) at 22. I fail to see how this renders Wolgin's claim atypical. Wolgin, like each of the absent class members, seeks redress from those whose conduct distorted the trading price of Magic Marker shares. Wolgin's claim, like the claim of each absent class member, does not turn on whether the shares were purchased through a defendant brokerage firm, a nondefendant brokerage firm, or (as in Wolgin's case) some other source.

Nor is Wolgin's claim atypical simply because Wolgin professes to be a sophisticated buyer of securities. Defendants suggest that Wolgin's sophistication leaves his claim vulnerable to the defense of (lack of) due diligence. *See generally Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 596–98 (3d Cir.

1976). Be that as it may, the present record certainly does not suggest that Wolgin is unique among class members in this respect. I therefore see no reason to fear that Wolgin, as a class representative, will be "distracted by a relatively unique personal defense." *Koos v. First National Bank*, 496 F.2d 1162, 1165 (7th Cir. 1974). If it later appears that the due diligence defense is an issue with respect to some, but not all, of the class members, I can require separate hearings on that issue. *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685, 695 (E.D.Pa. 1977).

Fifth, defendants contend that plaintiffs Sidney Kampel, Maurice M. Charney, and Hanna K. Charney are atypical because their purchases of Magic Marker stock all occurred after November 30, 1972. This is the date upon which the criminal conspiracy alleged in *United States v. Yiddy Bloom*, Crim. No. 77–383, ended. *See generally United States v. Bloom*, 450 F.Supp. 323 (E.D.Pa.1978); *United States v. Bloom*, 78 F.R.D. 591 (E.D.Pa.1977). Undoubtedly, plaintiffs will rely at trial on numerous facts established by the criminal proceedings in order to help prove classwide civil liability here. In this respect, defendants argue, Kampel and the Charneys are atypical, for they will have to establish either that the conspiracy continued *past* November 30, 1972, up until the time of their purchases, or at least that its effects on the trading price of Magic Marker stock continued up until that time. Defendants assert that Kampel and the Charneys, as well as any other class member who purchased shares on or after November 30, 1972, "cannot rely upon any criminal convictions, or any facts which may be established thereby, to prove the existence of an ongoing conspiracy at the time they purchased." Defendants' Memorandum in Opposition (Document No. 203) at 24. That, of course, is an overstatement. To put it more accurately, Kampel and the Charneys (and similarly situated class members) cannot rely *solely* upon facts developed in the criminal proceedings. Rather, they will presumably have to develop some additional proof. But

that additional proof will only complement the proof regarding defendants' activities prior to November 30, 1972: the "late purchasers" will simply attempt to prove that the conspiracy (or its effects) continued after that date. I see little potential indeed for conflict between the "early purchasers" and the "late purchasers." Moreover, the creation of subclasses (each headed by appropriate representatives) could surely handle such a conflict if one were to arise. At this point, I do not believe that Kampel and the Charneys have presented atypical claims.

■ Finally, defendants argue broadly that the typicality requirement simply cannot be met here, due to the need for individual proof of reliance by each plaintiff. The short answer to this contention is that individual proof of reliance would appear unnecessary where, as here, plaintiffs allege a fraud on the market rather than numerous individual fraudulent misrepresentations. *See, e.g., Little v. First California Co.,* 532 F.2d 1302, 1304 n.3 (9th Cir. 1976) (dictum) ("causation in an open market situation consists in showing that deception affected the market and that damage to the plaintiff resulted"); *Blackie v. Barrack,* 524 F.2d 891, 906–07 (9th Cir. 1975) (alternative holding) (collecting authorities), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Helfand v. Cenco, Inc.,* 80 F.R.D. 1, 8–9 (N.D.Ill.1977); Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5,* 88 Harv.L.Rev. 584, 592–96 (1975). In any event, "[t]he speculative possibility that the defendants may have a right to show nonreliance for each class member and that they may wish to exercise this right is not enough to defeat a class

action." *Simon v. Westinghouse Elec. Corp.,* 73 F.R.D. 480, 486–87 (E.D.Pa.1977).

### Adequate Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." As the court of appeals recently observed, "[t]his prerequisite embodies concerns which fall into two categories: that the representatives and their attorneys will competently, responsibly and vigorously prosecute the suit, and that the relationship of the representative parties' interests to those of the class is such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit." *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 449 (3d Cir. 1977) (citations omitted), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Defendants argue that Rule 23(a)(4) is not satisfied here because (1) the named plaintiffs lack sufficient knowledge of the facts alleged in the complaint, (2) the named plaintiffs may be unable to bear the costs that will be incurred in this litigation, and (3) the named plaintiffs are over-represented by counsel. None of these contentions is persuasive.[1]

■ First, defendants urge that none of the named plaintiffs "has any personal knowledge of any wrongdoing alleged in the consolidated complaint." Defendants' Memorandum in Opposition (Document No. 203) at 30 n.2. Given that the complaint alleges *undisclosed* conspiratorial activity to manipulate stock prices, it would be quite surprising if any of the named plaintiffs had any *personal knowledge* of those activities. Moreover, I observed in *Axelrod v. Saks & Co.,* 77 F.R.D. 441, 445 (E.D.Pa.

---

1. Defendants' vehement opposition to this motion for class action certification has apparently led defense counsel to take certain liberties with the precedents upon which they rely. I was particularly surprised to see my own opinion in *Axelrod v. Saks & Co.,* 77 F.R.D. 441 (E.D.Pa.1978)—an opinion in which I found *no* conflicts of interest among the named plaintiffs and the class members, and so unhesitantly certified the proposed class—cited by defendants here in support of this proposition: "Numerous courts have viewed the presence of

even a potential conflict as a ground for summary denial of class certification." Defendants' Memorandum in Opposition (Document No. 203) at 27. The citation to *Axelrod* was preceded by the "*cf.*" signal, which generally means that the "[c]ited authority supports a proposition different from that in text but sufficiently analogous to lend support." A Uniform System of Citation § 2:3(a) at 7 (12th ed. 1976). One can only wonder what proposition "sufficiently analogous" to the quoted proposition derives support from *Axelrod.*

1978), that "a would-be class representative in a complex antitrust case need not have, and often will not have, personal knowledge of facts sufficient to make out a prima facie case." The same holds true in a complex securities case such as this one. The named plaintiffs here are not so ill-informed as to be inadequate class representatives.

Second, defendants argue that the named plaintiffs have not sufficiently demonstrated their willingness and ability to bear the costs incurred in this litigation. It may well be that at some point in time, a class representative's inability or unwillingness to assume the costs of litigation will impair the representation afforded to absent class members. But this case gives me little cause for concern on that score. Defendants virtually concede that plaintiff Wolgin is willing and able to bear whatever costs are likely to be incurred here. Too, each of the other named plaintiffs has acknowledged his or her obligation to assume the costs of litigation. Defendants also concede that counsel for each of the named plaintiffs stated at deposition sessions that counsel would advance the costs on behalf of their clients. No suggestion of unethical conduct has been made in this connection. I cannot say that Rule 23(a)(4) requires a greater showing on behalf of the named plaintiffs.

Third, defendants question the need for "burdening the purported class with representation by the multitude of counsel who have entered their appearances" in this action. Defendants' Memorandum in Opposition (Document No. 203) at 38. In their brief, defendants note that ten different law firms or individual attorneys have entered appearances on behalf of the six named plaintiffs (counting the Altcheks and the Charneys as only two plaintiffs). They predict that this "over-representation" will result in excessive attorney time being devoted to this litigation, and that, if plaintiffs prevail at trial, the class will be burdened by a fee award that includes compensation for unnecessary work. Yet defendants concede that I have the power to review all fee petitions to insure that the class is *not* burdened in this manner. De-

fendants' argument, stripped to its core, is that "the Court should not be forced to undertake the difficult task of screening a multitude of fee petitions to ascertain the unnecessarily duplicative work that inevitably will occur from these multiple representations, the necessity of which is at this late date completely unestablished." *Id.* 37–38. This is an odd way to challenge the adequacy of representation that will be provided by counsel for the named plaintiffs. In effect, defendants fear a *superabundance* of representation. So long as any duplicative work that may be performed does not result in a financial burden to the class, I see no merit in this argument.

As to the ability of counsel for the named plaintiffs, I am fully satisfied that they are capable of conducting the proposed class action in a vigorous and efficient manner. My conclusion in this regard is supported by the detailed affidavits describing the five law firms that are principally responsible for representing the named plaintiffs. *See* Plaintiffs' Memorandum of Law (Document No. 40), Exhibits A, E & F; Exhibits J & K to Plaintiffs' Reply Memorandum (Document No. 217). Accordingly, plaintiffs have satisfied Rule 23(a)(4).

### Rule 23(b)(3) Requirements

Because plaintiffs seek to maintain this class action pursuant to Rule 23(b)(3), they must satisfy the two requirements imposed by that rule: predominance and superiority. I shall consider these in turn.

### Predominance of Common Questions

First, Rule 23(b)(3) requires a finding by the court that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." The court's finding of predominance "requires at a minimum the identification of the legal and factual issues, common and diverse, and an identification of the class members to which those relate." *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 756 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d

125 (1974). But the predominance inquiry, as Judge Aldisert recently observed,

"is not simply a matter of numbering the questions in the case, labelling them as common or diverse, and then counting up. It involves a sophisticated and necessarily judgmental appraisal of the future course of the litigation, as well as an evaluation of the most efficient means of proving the claims and the time that will be consumed by each aspect of the proof." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 461–62 (3d Cir. 1977) (Aldisert, J., dissenting), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

Defendants emphasize various "individual issues," which they believe loom so large in this case as to preclude a finding of predominance. I shall address these issues in turn.

To begin with, defendants stress that this case "presents hundreds of purportedly deceptive acts and statements, allegedly taken pursuant to a conspiracy, each of which had a varying and uncertain impact on the price of Magic Marker stock." Defendants' Memorandum in Opposition (Document No. 203) at 42. In part, their argument is that damages must be computed individually for each class member. But the "overwhelming weight of authority" holds that the need for individual damages calculations does not diminish the appropriateness of class action certification where common questions as to liability predominate. 5 Newberg on Class Actions § 8824(b) at 879 (1977); *see, e.g., Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977) (antitrust action), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) (securities fraud action), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). Moreover, plaintiffs contend that proof of damages may be accomplished through the development of a "value line" that will show, for any given day during the class period, what the trading price of Magic Marker stock would have been, but for the alleged conspiracy. If this proposed mechanical approach to damages computation turns out to be viable, it will simplify that phase of the case and it will underscore the predominance of common liability issues here.

In a related argument, defendants note that each class member must prove causation, and they suggest that individual questions of causation will predominate here, due to the complex fact pattern alleged in the complaint. But this is really just a reiteration of defendants' reliance argument, which I earlier rejected. In the context of open-market fraud, such as plaintiffs have alleged here, proof of individual reliance is not an element of causation. As one commentator noted:

"When a deception allegedly caused damage by means of its impersonal effect on a securities market, proof of causation requires showing that the deception affected the market and that damage to the plaintiff resulted. The concept of plaintiff's own reliance is totally unrelated to either link of the causal chain. As Professor Bromberg has pointed out, a person who trades during the period in question may be harmed by a deception that affects prices and conditions in the relevant market, regardless of whether he has relied on or even heard the deception."

Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5*, 88 Harv.L.Rev. 584, 592–93 (1975) (footnote omitted).

Thus, proof of causation here simply will not require a detailed probe into the individual circumstances surrounding each class member's transactions in Magic Marker stock. Accordingly this objection to predominance is unfounded.

Defendants also assert that an unknown, but substantial, number of class members may have narrower claims under Rule 10b–5 against one or more defendants based on their particular dealings with those defendants. For example, the complaint alleges that defendants Cronin, Street, and Richter "purchased Magic Marker common stock for customer accounts at the Washington, D. C. office of defendant Hornblow-

er and at the Miami Beach, Florida, office of defendant Hentz without first obtaining the consent and authorization of said customers." Second Consolidated Amended Complaint ¶ 65(d)(8). The customers for whose accounts these unauthorized purchases were made may have claims against those defendants "for churning or employment of manipulative devices." Defendants' Memorandum in Opposition (Document No. 203) at 54. These customers, like the other class members with specific claims against various defendants with whom they dealt, could seek to establish liability based on the circumstances of their individual transactions, without the need to prove the wide-ranging conspiracy alleged in the complaint. Moreover, defendants assert (without explanation) that these class members could then recover damages under a formula more favorable to them than the formula applicable to the classwide price-manipulation claim asserted in the complaint.

From the foregoing, defendants conclude that common questions do not predominate here. First, they assert (without explanation) that the named plaintiffs would be obliged to assert such specific claims on behalf of any class members who might benefit therefrom. As a result, "the trial would immediately break down into a series of individual trials, with each class member offering proof regarding his or her individual purchases." Defendants' Memorandum in Opposition (Document No. 203) at 55–56 (footnote omitted). Thus, defendants argue, individual issues would predominate over common issues.

I find this argument unpersuasive. Assuming *arguendo* that a substantial number of class members *could* assert specific claims based on their individual dealings with various defendants, it does not follow that they will seek to assert such claims in this action, or that they would have any right to do so. Individual claims of this sort, as defendants themselves point out, "would have no relationship to any claim of the other class members." Defendants' Memorandum in Opposition (Document No. 203) at 54. Should a class member with such a claim decide, after receiving notice

of this action, to preserve his individual claim rather than to cast his lot with the class as it presses its price-manipulation claim, he is free to opt out of the class. This course of action might commend itself to some class members, depending entirely on the nature of their individual claims against particular defendants. In any event, the option exists. And defendants are mistaken in their assumption that a class member who chose *not* to opt out could present his individual claim in this action. The class representatives would devote little time indeed to a claim that bears no relationship whatever to any other class member's claim. Nor would the hypothetical "individualist" class member have a right to intervene and present his claim himself: Rule 23(d) gives the court ample discretion to exclude proof of a unique claim by a class member. *See generally Developments in the Law—Class Actions,* 89 Harv.L.Rev. 1318, 1482–85 (1976). Thus, the individual claims that some class members may have against some defendants do not figure significantly in the predominance inquiry.

This approach to these individual claims raises questions about the res judicata effect of a judgment adverse to the class. If class member *X*, who has a substantial individual claim against defendant *Y*, chooses not to opt out of this class, and if defendants prevail on the classwide liability issue, will that adverse judgment bar *X* from asserting a narrower individual claim against *Y*? Or will *X* be able to avoid the preclusive effect of that judgment by arguing that he was in fact unable to assert his individual claim in this action? Without resolving any of these issues, I simply note that counsel, in the course of drafting a proposed form of notice to absent class members, should give some thought to these problems.

Defendants urge that application of the appropriate state statute of limitations will raise a horde of individual questions, again negating the predominance required by Rule 23(b)(3). But the statute-of-limitations issues involved here are not exotic,

and the courts have repeatedly held that "the presence of individual issues of compliance with the statute of limitations . . does not defeat the predominance of . . common questions." *Cameron v. E. M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976); *see, e. g., Sullivan v. Chase Inv. Services*, 79 F.R.D. 246, 264–65 (N.D.Cal.1978); *Simon v. Westinghouse Elec. Corp.*, 73 F.R.D. 480, 487 (E.D.Pa.1977).

Based on the foregoing discussion, I believe that common issues predominate over individual issues. The issues common to the class include (a) the existence of a conspiracy among defendants to manipulate the price of Magic Marker securities, (b) whether defendants performed the various acts alleged in the complaint, (c) what impact defendants' activities had on the price of Magic Marker securities, and (d) what measure of damages should be used to compensate the class members. These issues lie at the core of this case. On the other hand, the issues that require individual determinations include (a) the amount of damages sustained by each class member, (b) the application of the statute of limitations to each class member, and (c) the application of other defenses, such as (lack of) due diligence or the doctrine of *in pari delicto*, to each class member. As I noted earlier, the damages issue rarely defeats predominance. As for the various defenses, they would appear at this time to be overshadowed by the common liability issues just enumerated. Accordingly, I find that common issues predominate here.

### Superiority

Rule 23(b)(3) also requires a finding by the court that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Defendants contend that the superiority requirement cannot be met here, because the proposed class action (1) would be of little or no benefit to the class members, and (2) would present insuperable management difficulties for the court. I am not persuaded by either assertion.

First, defendants stress that the concluded criminal proceedings against several of the named individual defendants here will greatly facilitate proof of the conspiracy alleged here. From this premise, defendants somehow conclude that the *only* common proof to be offered on behalf of the class would be material developed in those criminal proceedings. Therefore, defendants argue, each individual purchaser of Magic Marker stock could easily institute his own action "in a convenient, close-to-home forum," and take advantage in that action of all material developed during the criminal proceedings. Defendants' Memorandum in Opposition (Document No. 203) at 71. In short, the proposed class action would afford no benefit to the class members that they could not secure individually by bringing their own actions.

This argument, however, is flawed on two counts. For one thing, defendants' assumption that the common proof to be offered in the class action would be limited to material developed in the criminal proceedings is completely unfounded. As plaintiffs point out, their interest lies in proving as many of the acts alleged in the complaint as they can, whereas the Government's burden in the criminal proceedings was simply to show *some* overt act in furtherance of the alleged criminal conspiracy. Plaintiffs here seek to prove that defendants' conduct significantly affected the trading price of Magic Marker stock, and so the common proof offered on behalf of the class will probably go beyond that developed in the criminal proceedings. Moreover, even if each individual purchaser *could* somehow obtain all the common proof and use it in his own action, many purchasers would predictably decline to do so because their claims were too small to warrant such litigation. Thus, the proposed class action would benefit the class members, whereas defendants' alternative—duplicative individual lawsuits—would not.

Defendants challenge this finding on the ground that each "individual claimant would be required to appear on his own behalf to prove the effect of the conspiracy on his or her purchases and the damage

suffered thereby before the claimant could recover." Defendants' Memorandum in Opposition (Document No. 203) at 72. But this conclusion is unwarranted. As for the effect of the conspiracy on the market—*i. e.*, causation—this would certainly be susceptible of proof on a classwide basis. And although each class member would have to prove the dates and amounts of his or her purchases, this presumably would not require a personal appearance by each class member. Accordingly, I believe that the proposed class action would substantially benefit the class members.

As a second argument, defendants emphasize the management difficulties that the proposed class action would present. Here, defendants refer again to the several issues that would require individualized proof: damages and various defenses. But the need for individualized proof with regard to certain issues does not by itself make the entire action unmanageable. At this early stage in the action, I see no reason to embrace defendants' dire prophecies of overwhelming manageability problems, although I concede that there will certainly be management problems.

In short, the proposed class action appears superior to the only existing alternative, which is repetitive individual litigation.

Because the proposed class action satisfies Rule 23(a) and Rule 23(b)(3), I shall grant plaintiffs' motion for class action certification with respect to the Rule 10b–5 claim stated in Count I. Plaintiffs also seek (and defendants again oppose) certification of the common-law claim(s) stated in Count II of the complaint. At this point, however, plaintiffs have utterly failed to elucidate their legal theory or theories under Count II, and I am unable to determine whether Count II is appropriate for class action treatment. Accordingly, I shall deny the motion with respect to Count II, without prejudice to plaintiffs' right to renew their contentions after submitting additional materials for consideration.

## MOTION TO DISMISS

■ Defendants Shearson, Hayden Stone, Inc., Shearson, Hammill & Co., Inc., H. Hentz & Co., Inc., Yiddy Bloom, Magic Marker Corporation, and Albert London [2] move to dismiss the second consolidated amended complaint for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). In support of their motion, defendants urge that the exclusive remedy for the wrongs alleged in the complaint is the private civil action expressly authorized by section 9(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78i(e) (1976). Plaintiffs have not pleaded section 9(e), however, and they have relied primarily on the implied private right of action under Rule 10b–5. Defendants argue that the complaint should be dismissed because a Rule 10b–5 remedy may not be implied in the face of the express section 9(e) remedy. This argument has considerable appeal, but I nevertheless conclude that defendants' motion should be denied.

At the outset, it may be helpful to emphasize that defendants' argument is *not* directed to the substantive scope of either section 10(b) or Rule 10b–5. Defendants seem to concede that section 10(b) and Rule 10b–5, taken apart from the rest of the 1934 Act, would prohibit the type of activity alleged in the complaint. *Cf., e. g., SEC v. Resch-Cassin & Co.*, 362 F.Supp. 964, 975 (S.D.N.Y.1973) ("It is well settled that the manipulative activities expressly prohibited by § 9(a)(2) . . . with respect to a listed security are also violations of . . . § 10(b) . . . when the same activities are conducted with respect to an over-the-counter security."). *See generally Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977) (dictum) ("No doubt Congress meant [through section 10(b)] to prohibit the full range of ingenious devices that might be used to manipulate securities prices."). They argue, though, that however broad the substantive coverage of section 10(b)

---

**2.** *Defendant Amherst Securities Corporation,* which originally joined in this motion, recently entered into a settlement agreement with plain-

tiffs and withdrew its motion (subject to eventual court approval of the settlement).

and Rule 10b–5 may be, neither of these provisions may properly supply an implied remedy here. In essence, defendants urge that because section 9(e) of the 1934 Act expressly provides a private civil remedy for the wrongs alleged in the complaint, plaintiffs may not assert an implied right of action under either section 10(b) or Rule 10b–5.

Plaintiffs, for their part, seem to concede that many of the wrongs alleged in the complaint amount to violations of section 9(a) of the 1934 Act, which prohibits not only wash sales and matched orders, but also other transactions that create "actual or apparent active trading in [a] security . . . for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2) (1976). It follows from this that section 9(e) would afford plaintiffs a civil remedy for many of those wrongs. 15 U.S.C. § 78i(e) (1976). But plaintiffs contend that they may assert an implied right of action under Rule 10b–5, notwithstanding the availability of an express remedy under section 9(e).

The section 9(e) remedy differs in several respects from the implied remedy under Rule 10b–5. Section 9(e) contains a relatively short statute of limitations, permits the court to require security for costs, limits damages to losses sustained by reason of the unlawful price manipulation, provides for contribution by persons not joined as defendants in the original action, and permits the court to assess attorneys' fees against either party. Defendants here seek to obtain the benefit of these restrictions, particularly the short statute of limitations.

Defendants urge that it would defeat the manifest intent of Congress if plaintiffs could bypass the section 9(e) remedy, which contains the several restrictions just noted, and rely instead on an implied right of action under Rule 10b–5, which would be free of those restrictions. To be sure, the problem of reconciling section 9(e) with the implied remedies under section 10(b) and Rule 10b–5 has not escaped notice. *See Schaefer v. First Nat'l Bank*, 326 F.Supp. 1186, 1189 (N.D.Ill.1970), *appeal dismissed per curiam*, 465 F.2d 234 (7th Cir. 1972); Hazen, *A Look Beyond the Pruning of Rule*

*10b–5: Implied Remedies and Section 17(a) of the Securities Act of 1933*, 64 Va.L.Rev. 641, 657 (1978). Yet, in the only litigation where this precise problem arose, both the district court and the court of appeals agreed that plaintiffs were *not* limited to the express remedy of section 9(e). *See Schaefer v. First Nat'l Bank*, 509 F.2d 1287, 1291–93 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976); *Schaefer v. First Nat'l Bank*, 326 F.Supp. 1186, 1189–90 (N.D.Ill.1970), *appeal dismissed per curiam*, 465 F.2d 234 (7th Cir. 1972). Rather, the Seventh Circuit stated: "The plaintiffs may make their claim for relief under Rule 10b–5 even though the alleged market rigging scheme also falls squarely within [the prohibition of] section 9(a)(2)." *Schaefer v. First Nat'l Bank*, 509 F.2d 1287, 1293 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976). Defendants' principal response to the Seventh Circuit's *Schaefer* decision is that the Supreme Court implicitly overruled *Schaefer* when it decided *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In my view, however, part II–C of the Court's *Hochfelder* opinion, which defendants emphasize, is not inconsistent with *Schaefer.*

The result reached in *Schaefer* seems correct, moreover, due to an overriding practical consideration: the "no-overlap" rule that defendants advocate would be extremely difficult to administer. Such a rule would require the court in every section 10(b) or Rule 10b–5 case to determine, *on a pretrial motion*, whether the wrongs alleged in the complaint could arguably give rise to liability under one of the express civil remedies of the 1933 Act or the 1934 Act. This determination would often turn on the precise facts of a given case, so that the court might be unable to act until discovery was completed. Too, this pretrial determination might raise difficult legal issues regarding the applicability of a particular express remedy. The section 9(e) remedy, for example, has been infrequently utilized, and it is not at all far-fetched to suppose that questions of first impression might arise in the course of determining whether a plaintiff who sought to rely on Rule 10b–5 might

in fact have a claim under section 9(e). In short, "[s]uch a procedure . . . would significantly burden an already complex area of the law." *Wachovia Bank & Trust Co. v. National Student Marketing Corp.*, 461 F.Supp. 999, 1006–07 n.15 (D.D.C.1978).

Thus, both precedent and policy counsel against restricting the implied remedy under Rule 10b–5 to those claims that could not be brought under one of the express remedies contained in the federal securities laws, and I shall accordingly deny defendants' motion. I recognize, however, that the court of appeals may view the matter differently. I have therefore urged plaintiffs to amend their complaint so as to plead liability under section 9(e) as an alternative theory. I shall also enlist the aid of counsel in conducting this case in such a manner that all factual issues bearing on section 9(e) liability are presented to the jury during the trial. This approach should serve to obviate the need for a new trial in the event that the court of appeals ultimately accepts defendants' argument that section 9(e) provides the exclusive remedy for the wrongs alleged here.