Frank McNICHOLS, Plaintiff,

v.

LOEB RHOADES & CO., INC., a Maryland corporation, and Loeb Rhoades & Co., a partnership, Defendants.

Louis SINGER, as Successor in Interest to Troster Singer & Co., Plaintiff,

v.

LOEB RHOADES & CO., INC. and Loeb Rhoades & Co., Defendants.

Nos. 78 C 947, 81 C 3699.

United States District Court, N.D. Illinois, E.D.

Aug. 31, 1982.

William J. Harte, Kevin M. Forde, Richard J. Prendergast, Chicago, Ill., for Thomas Origer.

Jay R. Franke, Don H. Reuben, James A. Serritella, Reuben & Proctor, Chicago, Ill., for Maryville Academy.

Stephen C. Sandels, Steven H. Hoeft, McDermott, Will & Emery, Chicago, Ill., for John R. & Donna R. Powell, First Investors Discovery Fund, First Investors Fund for Growth & First Investors Trend Fund.

Robert S. Levin, Richard J. Phelan, Michael A. Pope, John M. Christian, Phelan, Pope & John, Chicago, Ill., for Hilda B. Mangel and Wendell M. Mew.

John W. Dondanville, Baker & McKenzie, Chicago, Ill., for Ins. Co. of North America.

William E. Snyder, Thomas W. Johnston, Chadwell, Kayser, Ruggles, McGee & Hastings, Ltd., Chicago, Ill., for Robert Wilson & Robert Wilson Associates.

John M. Hadlock, Michael S. Press, Whitman & Ransom, New York City, for First Investors Discovery Fund, First Investors Fund for Growth & First Investors Trend Fund.

Andrew C. Freedman, Reavis & McGrath, New York City, for Robert Wilson and Robert Wilson Associates.

Lowell B. Komie, William Levinson, Levinson, Komie & Murray, P.C., Chicago, Ill., for Arnold Heltzer.

David O. Danis, Whalen, O'Connor, Danis & Tobben, St. Louis, Mo., James P. Chapman, Chapman & Royce, Ltd., Chicago, Ill., for Thomas P. Danis.

William M. Ward, David M. Hartigan, Michael J. Hogan, Hartigan & Ward, Chicago, Ill., for Deane W. Lindstrom, Victor H. Fink and Sheila Fink, Paul B. Smithson, Mary C. Smithson, Susan Smithson, Paula

B. Smithson and Janet Smithson, Robert A. Byfield, Frances Piacenti, Gerald M. Aamodt, Michael Aamodt and Ann Aamodt.

William Thomas Huyck, Gerald A. Niederman, Roan & Grossman, Chicago, Ill., for Frances V. Papas.

Nicholas J. Etten, Richard G. Schultz, Kenneth W. Sullivan, Foran, Wiss & Schultz, Chicago, Ill., for Richard and Peggy Shure, Strombecker Corp., Penta Capital, Alan H. Shure and Myron B. Shure.

Lowell E. Sachnoff, Andrew M. Schatz, George A. Vinyard, Steven H. Cohen, Sachnoff, Weaver & Rubenstein, Ltd., Herbert Beigel, Barnett & Beigel, Chicago, Ill., for J. William Holland.

Ronald A. Lev, Lev & Sneckenberg, Chicago, Ill., for Rikki's, Inc., William T. Valos.

Henry L. Pitts, John V. Ryan III, William M. Stevens, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for Jon Hedrich.

Edward T. Joyce, Christopher J. McElroy, Steven J. Rotunno, John T. Doyle, Joyce & Kubasiak, P.C., Chicago, Ill., for Frank McNichols and Louis Singer.

Lewis S. Sandler, New York City, for Louis Singer.

John J. Enright, Jeffrey R. Liebman, Arvey, Hodes, Costello & Burman, Chicago, Ill., for Marina Bank.

George W. Thompson, John E. McGovern, Jr., Kendall R. Meyer, John Michael Ryan, Wilson & McIlvaine, Chicago, Ill., for Walter M. Glass.

D. Daniel Barr, Larry L. Thompson, Bell, Boyd & Lloyd, Chicago, Ill., for Thomson McKinnon Securities.

Howard R. Koven, Steven L. Bashwiner, H. Nicholas Berberian, Friedman & Koven, Chicago, Ill., for Loeb Rhoades & Co., Inc., Loeb Rhoades & Co., First Wall Street Settlement Corp., and all partners, officers and directors unless otherwise specified.

Howard A. Tullman, Chicago, Ill., for Victor Nemeroff.

Paul B. Uhlenhop, Lawrence, Lawrence, Kamin & Saunders, Chicago, Ill., for Richard J. Bertoldi.

Harry F. Polos, Chicago, Ill., for A.T. Tsoumas.

## MEMORANDUM OPINION AND ORDER

### GETZENDANNER, District Judge.

This case is before the court on plaintiffs' motion for class certification. It is one of sixteen consolidated cases alleging securities fraud violations against Loeb Rhoades & Co., Inc. and other defendants. The two named plaintiffs are Frank McNichols, an individual investor, and Louis Singer, who purports to act as successor in interest to Troster Singer & Co. ("TSCo"), a professional market maker in over-the-counter securities. The class that they seek to represent is defined as comprising "all persons similarly situated who have purchased or sold Olympia Brewing Company ("Olympia") common stock during the period beginning June 2, 1975 and ending April 22, 1977, from Loeb Rhoades and others."[1]

Plaintiffs' allegations insofar as they relate to the class issue are as follows. On June 2, 1975, the opening date for the class, Jack Bernhardt, an account executive for Loeb Rhoades, commenced trading in Olympia stock. Over the next two years Bernhardt, with the connivance of Loeb Rhoades, manipulated the market to artificially inflate the price of Olympia stock. On February 11, 1977, Loeb Rhoades discharged Bernhardt for his misconduct but did not reveal to the investing public that he had manipulated the market. Loeb Rhoades continued to manipulate the market after Bernhardt was discharged. Bernhardt immediately began employment with Swift, Henke & Co., Inc., an active market maker in Olympia. On March 3, 1977, the stock reached a high of $61.75 per share.[2]

On Sunday, March 6th, an article appeared in *Barron's* in which the author gave his opinion that Olympia stock was overpriced and reported that a company spokesman had denied rumors of a possible takeover. On Monday, the price of Olympia stock dropped 11 points. By the end of the week, the word on the streets was that Swift, Henke was in a "capital bind" because its retail customers were not paying for their substantial purchases of Olympia stock from the preceding week. On Friday, March 11th, Olympia dropped another 16 points. The following Monday, it continued to decline and on that same day the SEC suspended Swift, Henke for violations of its net capital rules. Trading in Olympia was suspended for ten days. From the resumption of trading on March 25th until the close of the class period on April 22nd, Olympia experienced a further net decline of almost 8 points.

The common course of conduct that Bernhardt and Loeb Rhoades allegedly followed to manipulate the price of Olympia stock included deceptive or improper transactions, affirmative misrepresentations, omissions, and failures to supervise. The fraudulent transactions involved schemes whereby customers were permitted to purchase stock with insufficient checks or through improper extensions of credit, unauthorized purchases and sales in customers' accounts, and sham transactions. Plaintiffs accuse Loeb Rhoades of misrepresenting the true value of Olympia, that it was a likely takeover or merger candidate, that the price of its stock would rise as short sellers covered their positions, and that it was unmarketable at times when substantial trading was occurring.[3] The facts that Loeb Rhoades al-

---

**1.** The choice of April 22, 1977, as the closing date for the class appears to be totally arbitrary. Plaintiffs state that the class period extends 21 trading days after the SEC suspended trading in Olympia stock, but do not explain why this extension is appropriate.

**2.** Loeb Rhoades puts the figure at $60 bid, $61.50 asked.

**3.** Plaintiffs do not identify to whom these misrepresentations were made, apart from McNi-

chols, other than to say they were made to customers a members of the investing public. If plaintiffs are alleging that the misrepresentations were made publicly, they have not identified how they were made. There is nothing in the record before the court to show that there was a single statement or a series of essentially similar statements that were generally disseminated to the public. Plaintiffs in other cases with which this case is consolidated for pretrial purposes allege specific misrepresentations made individually to them.

legedly failed to disclose include the reasons for Bernhardt's discharge, Loeb Rhoades' trading for its own account and its control of the "float" in Olympia, as well as the existence of the scheme to inflate the price of Olympia. All of these acts and omissions are said to have constituted a *fraud on the market* that caused plaintiffs' injuries when they relied on the market's integrity and traded in Olympia.

*Class Certification*

To sustain a class action under Rule 23(b)(3), Fed.R.Civ.P., plaintiffs must establish that the four prerequisites of Rule 23(a) have been met: numerosity, commonality, typicality, and adequacy of representation. They must also demonstrate that the common class issues predominate over any questions affecting only individual class members and that a class action is superior to other methods of litigating the case. Although Loeb Rhoades contests plaintiffs' showing as to all of the requirements, the parties have focused on the interrelated issues of the typicality of the named plaintiffs' claims and the adequacy of their representation. Because the court finds these issues dispositive, it will only address them and offers no opinion on the others.

*Typicality and Adequacy*

 Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims and defenses of the class." This requirement also impacts on the requirement in Rule 23(a)(4) that the representative parties "adequately protect the interests of the class." [4] If the representatives' claims are not typical of the class, they cannot adequately protect the interests of the absent class members.

---

**4.** Courts have indicated that adequate representation involves two elements: that the representative party's interests coincide with those of the class; and that the representative and his counsel litigate vigorously on behalf of the class. *E.g., Mersay v. First Republic Corp.,* 43 F.R.D. 465, 469 (S.D.N.Y.1968). The first requirement, the coincidence of interests, is akin to the typicality requirement.

**5.** Plaintiffs' Memo in Support at 9.

**6.** Plaintiffs attempt to limit *Koos* to its facts. The claim there rested on the Illinois Usury

*See General Telephone Co. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2371 n. 13, 72 L.Ed.2d 740 (1982); *Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1298, 1301 (N.D.Ill.1981); *In re LTV Securities Litigation,* 88 F.R.D. 134, 149 (N.D.Tex.1980).

 Plaintiffs argue that the typicality requirement focuses on the defendant's conduct and its common effect on the members of the class.[5] This argument misconstrues the plain language of the rule; the focus is on the representative's position with respect to the defendant's conduct. *See LTV Securities, supra,* 88 F.R.D. at 149. It is a well settled rule in this circuit that where the representative party is subject to unique defenses his claim is not typical of the class. *J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 998–99 (7th Cir.1980); *Koos v. First National Bank,* 496 F.2d 1162, 1164 (7th Cir.1974).

In *Koos,* the Court stated the rule as follows:

> Where it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative.

496 F.2d at 1164. Under the rationale in *Koos,* it is not necessary that the defense asserted against the putative class representative ultimately succeed. To negate the typicality of the representative's claim, it is only necessary that the defense be unique, arguable and likely to usurp a significant portion of the litigant's time and energy.

The Seventh Circuit reaffirmed the *Koos* rationale in *J.H. Cohn.*[6] In that case, the

---

Law. The Seventh Circuit was reviewing the district court's dismissal of the action as well as its denial of class certification, and it affirmed both. Plaintiffs argue from this that *Koos* stands only for the proposition that a named plaintiff who fails to state a claim is an atypical and inadequate representative. While this is undoubtedly true, the language used in *Koos* reveals that the Court's opinion has a much broader application. Moreover, in *J.H. Cohn* the Seventh Circuit refused to order the class certified due to the presence of a unique,

named plaintiff was an open-end, diversified mutual fund. The Court reasoned:

> The Evergreen Fund is a sophisticated investor very familiar with financial statements. Such an investor may not be as justified in relying on any material misrepresentations or omissions of material facts as other purchasers of American Appraisal stock. While the availability of a defense of justifiable reliance is not clearly settled, this court has indicated that *the presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality* of the class as well as bring into question the adequacy of the named plaintiff's representation. . . . The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer.

628 F.2d at 998–99 (emphasis added). *See also Ridings v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas) Ltd.*, 94 F.R.D. 147, 152 (N.D.Ill.1982).

Loeb Rhoades argues that McNichols' deposition testimony reveals that McNichols relied on Ralph Lynch, his account executive at Loeb Rhoades, in making his investment decisions, and that he decided to purchase Olympia stock on the basis of verbal information from Lynch about potential takeovers of Olympia. To the extent McNichols' claims are based on oral misrepresentations made to him alone, he must prove reliance, unlike those class members who had no face-to-face dealings with any employee of Loeb Rhoades, and whose reliance is presumed. And to the extent that his claims are based on his reliance on the market's integrity, Loeb Rhoades contends his own testimony shows the existence of an arguable defense.[7] As to Singer, Loeb Rhoades argues that he purports to stand in the shoes of TSCo, a professional market maker which made a market for Olympia stock, and that it did not rely on the integrity of the market price in its trading activities. Therefore, Loeb Rhoades concludes that class certification must be denied because the claims of both named plaintiffs are atypical, rendering them inadequate class representatives.

In *General Telephone Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2373, 72 L.Ed.2d 740 (1982), the Supreme Court emphasized that a class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." After carefully examining the pleadings and deposition testimony of the putative class representatives,[8] the court is not satisfied that the named plaintiffs have satisfied the requirements of typicality and adequacy of representation. There are arguable defenses peculiar to each of the named plaintiffs that are not applicable to the majority of the class. Accordingly, the motion for class certification must be denied.

*Fraud on the Market Cases*

As the gist of Loeb Rhoades' opposition to class certification is the existence of defenses unique to McNichols and Singer, it will be helpful as a preliminary matter to set out the elements of a fraud-on-the-market case under 10b–5[9] and to discuss the role of reliance in such a case.[10]

---

arguable defense, even though it reversed the dismissal of the individual claims. *Cf. Greenspan v. Brassler*, 78 F.R.D. 130, 132 (S.D.N.Y. 1978) (evidence of unique defense, while insufficient to compel summary judgment for defendants, was sufficient to vitiate typicality of named plaintiffs' claims).

**7.** Loeb Rhoades also advances a number of other unique defenses against McNichols, including estoppel or waiver, in pari delicto, and lack of credibility. The court's analysis at pp. 340–346, *infra*, obviates any need to decide whether these defenses are arguable.

**8.** The court previously permitted the parties to conduct discovery on the class issues.

**9.** The complaint alleges violations of other sections of the federal securities laws, but the parties have concentrated on the 10b–5 allegations.

**10.** The concept of reliance in securities fraud cases is sometimes explained as another way of referring to the requirement of causation in fact. The distinctions between reliance, materiality and causation can often be difficult to draw.

I note at the outset that the United States Supreme Court has granted certiorari in *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *cert. granted sub nom. Price Waterhouse v. Panzirer,* —— U.S. ——, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982) (discussed in footnote 12 of this opinion), and that the case presents the issue of the validity of the fraud-on-the-market theory. In that case, however, the plaintiff has suggested to the Supreme Court that the case has become moot and the Court is expected to rule on that issue during the week of September 20 or September 27. For purposes of ruling on the motion before this court, I assume the validity of the fraud-on-the-market theory.

■ The essential elements of a 10b–5 action include:

a material misrepresentation, omission, deception, or manipulation, *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); scienter—an intent to deceive, manipulate, or defraud the plaintiff, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194–97, 96 S.Ct. 1375, 1381–83, 47 L.Ed.2d 668 (1976); and some causal connection between the alleged violation and the injury to the plaintiff, *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

*Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1287 (N.D.Ill.1981).[11] In the ordinary 10b–5 case based on misrepresentation, reliance is also an essential element and the burden is on the plaintiff to prove that, relying on the defendant's misrepresentation, he purchased or sold stock. In 10b–5 cases based on a failure to disclose a material fact, however, while reliance remains an element of the cause of action, the burden of proving reliance has shifted.

Because reliance is so difficult to prove when a defendant has failed to disclose a material fact rather than misrepresenting it, the Supreme Court has allowed the trier of fact to presume reliance in an omission case where the plaintiffs could justifiably expect that the defendants would disclose material information. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *Ute* did not eliminate reliance as an element of a 10b–5 omission case; it merely established a presumption that made it possible for the plaintiffs to meet their burden. When the *Ute* presumption attaches, the defendant may rebut it by showing that the plaintiff did not rely on the defendant's duty to disclose. If the plaintiff would have followed the same course of conduct even with full and honest disclosure, then the defendant's action (or lack thereof) cannot be said to have caused plaintiff's loss.

*Shores v. Sklar,* 647 F.2d 462, 468 (5th Cir. 1981).

This presumption of reliance also plays a role in fraud-on-the-market cases. Courts have suggested that a plaintiff in such cases need not show individual reliance upon particular misrepresentations but only reliance upon the integrity of the market price of the security. *Shores, id.* at 469; *Ross v. A.H. Robins Co.,* 607 F.2d 545, 553 (2d Cir.1979) *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); and *Blackie v. Barrack,* 524 F.2d 891, 906–07 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). *See generally,* Note, "The Fraud-On-The-Market Theory," 95 Harv.L.Rev. 1143 (1982). In such cases,

[r]eliance is *presumed* once it is shown that a misrepresentation is material, or, what is substantially identical given the

---

11. The Supreme Court has defined materiality as contemplating:

a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the

omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

concept of materiality—once it is established that the material misrepresentation affected the price of stock traded on the open market. . . .

*In re LTV Securities Litigation,* 88 F.R.D. 134, 142 (N.D.Tex.1980) (emphasis in original).

This presumption of reliance derives from the concept of an efficient market, which concept is gaining judicial acceptance. *See, e.g., LTV Securities, id.* at 144:

> Indeed, economists have now amassed sufficient empirical data to justify a present belief that widely-followed securities of larger corporations are "efficiently" priced: the market price of stocks reflects all available public information and hence necessarily, any material misrepresentations as well.

The theory is that many investors use the efficiency of the market as a basis for making investment decisions: they "rely directly on the market to evaluate information for them rather than making their independent analysis of stocks." *Id.* As the *LTV* court explained the process and the role of reliance in it:

> In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price. If the investor did not rely on such agent, there has been no reliance. Thus a defendant should be able to attack such an investor's claim in much the same way he would in a face-to-face transaction—being allowed to offer proof that the reliance was upon matters extraneous to the market (to rebut the presumption).

*Id.* at 143–44.

A number of courts have recognized that the defense of nonreliance on the integrity of the market when raised against the named plaintiff in a fraud on the market case may destroy the typicality of his or her claims. *Lewis v. Johnson,* 92 F.R.D. 758 (E.D.N.Y.1981); *Kline v. Wolf,* 88 F.R.D. 696 (S.D.N.Y.1981); and *Greenspan v. Brassler,* 78 F.R.D. 130 (S.D.N.Y.1978).[12]

---

**12.** Plaintiffs strenuously argue that these cases have been overruled by the Second Circuit's opinion in *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *cert. granted sub nom. Price Waterhouse v. Panzirer,* —— U.S. ——, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982). This court, however, does not so read *Panzirer.* In that case, the named plaintiff's deposition testimony revealed that she had purchased stock on the basis of an article in the *Wall Street Journal.* The district court granted summary judgment against her, finding that plaintiff relied primarily on the article and only secondarily on the market's integrity and holding that such secondary reliance was insufficient to support her 10b–5 claim.

The Second Circuit reversed on this point, reasoning:

> that if Allied's report had been accurate, the stock analysts interviewed by the Journal would not have mentioned the company favorably, the Journal would not have devoted two paragraphs to Allied's prospects in the video cassette market, and plaintiff would not have been led by the article to buy her stock. . . . Though, at trial, the validity of the chain of causation will be tested, on summary judgment questions about this chain of causation must be resolved in favor of plaintiff, who in the case of a material fraud on the market enjoys a presumption of reliance. *Id.* at 367.

Moving on to the issue of class certification, the Second Circuit affirmed the district court's denial of class status on the ground that the named plaintiff exhibited a marked lack of credibility. The Court explicitly refrained from deciding whether the named plaintiff's "weak showing of reliance makes her claim atypical under Fed.R.Civ.P. 23(a)(3)." *Id.* at 368 n. 4.

As this is precisely the basis for the courts' rulings in *Lewis, Kline,* and *Greenspan,* the holdings in those three cases have not been overruled by *Panzirer* because the Second Circuit did not reach that issue. *See Lewis v. Johnson,* 78 CV 2488, slip op. at 2–3 (E.D.N.Y. March 19, 1982), where the court, on a motion for reargument of the denial of class certification in light of *Panzirer,* stated that the Second Circuit's reversal of the district court's dismissal was "immaterial" to the class certification issue.

In *Lewis v. Johnson,* 92 F.R.D. 758 (E.D. N.Y.1981), there were two named plaintiffs and the defendants successfully challenged their ability to represent the class on the basis of typicality. One plaintiff had purchased stock *before* the dissemination of the allegedly fraudulent statements and *after* news of the losses allegedly concealed by the statements had been made public, but not during the period in between. The court found that it was "apparent . . . that [the] purchases were made quite independently of the factors which allegedly caused the inflated prices at which the class members purchased [the] stock." *Id.* at 760. The court held that this difference in reliance amounted to a unique defense and precluded this plaintiff from representing the class, citing *Koos v. First National Bank,* 496 F.2d 1162, 1164 (7th Cir.1974).

The court also found that the other named plaintiff was subject to unique defenses.

> His possible reliance on the newspaper articles, coupled with his individual strategy of purposefully purchasing the stock when the price decreased, believing that the news signaled a possible turnabout, raise atypical reliance and materiality issues. . . . These issues create the possibility of defenses which could prejudice the class by becoming the focus of the litigation and diverting attention from the merits of the class action. See *Koos v. First Nat'l Bank, supra.*

92 F.R.D. at 760. Accordingly, the court denied class certification.[13]

In *Kline v. Wolf,* 88 F.R.D. 696 (S.D.N.Y. 1981), two named plaintiffs filed the case after the district court's dismissal of the complaint in *Panzirer v. Wolf, supra,* and prior to the Second Circuit's reinstating it, on the same cause of action alleged in *Panzirer.* Defendants attacked both putative representatives, arguing that the facts as developed showed that each relied on something other than the allegedly fraudulent annual report or the integrity of the market. The court agreed, reasoning that,

without passing on the merits of the defenses asserted against each named plaintiff, the mere existence of such unique defenses had a "potential adverse impact upon the class interest" that could not be ignored. *Id.* at 700. One plaintiff was susceptible to the argument that he was a speculative trader who purchased to "average-down" the per-share value of his stock. The other plaintiff alleged that she relied on her husband, who testified that he relied on their broker, but the broker denied this, raising the "unnecessary and vulnerable issue of their credibility to which the ultimate interest of the purported class should not be subjected." *Id.* The court, after noting that the presumption of reliance was rebuttable, denied class certification.

In *Greenspan v. Brassler,* 78 F.R.D. 130, 132 (S.D.N.Y.1978), the court found that the named plaintiffs' "possible reliance on another's expertise is sufficient to vitiate the typicality of their claims." There was some evidence that the named plaintiffs had purchased the stock based on their brother's recommendation, rather than their own analysis of the market performance of the stock, and that their brother had based his recommendation, in turn, on a generalized faith in real estate investment trusts rather than on the market's integrity.

> The court reasoned that:
> although the evidence is insufficient to compel summary judgment in defendants' favor, it does indicate that plaintiffs may be subject to defenses not applicable to other class members. Plaintiffs' . . . possible reliance on Noah's recommendation raise issues qualitatively different from the questions of individual reliance inherent in a fraud on the market suit. Although those questions normally do not preclude certification, class status must be denied when, as here, the putative representative is subject to unique defenses that will unnecessarily prejudice the class's probability of success.

> Plaintiffs argue that questions of reliance are irrelevant to our certification

---

13. As noted above, the *Lewis* court denied a motion for reargument in this case after the *Panzirer* decision came down, finding it inapplicable.

decision because proof of reliance is not a prerequisite to recovery in a Section 10(b) action. Proof of reliance on particular misrepresentations is indeed unnecessary in a case grounded on an alleged "comprehensive scheme to defraud." Reliance is presumed here upon plaintiffs' prima facie showing of a "fraud on the market." Defendant, however, can rebut this presumption, with proof that the market's integrity and the alleged misrepresentations were not material to plaintiffs or that they relied primarily on another source. Questions of reliance are thus relevant to plaintiffs' recovery in this action, and to our certification decision. *Id.* at 132–33.[14]

The courts in these three cases, applying the Seventh Circuit's teaching in *Koos,* all concluded that the issue of nonreliance on the market may constitute a unique defense against a named plaintiff in a fraud-on-the-market case, even though reliance is not an "individual" issue in such cases that would defeat certification on predominance grounds. Individual questions of reliance do not predominate in a fraud-on-the-market case because reliance is presumed once materiality has been established. But because the presumption of reliance is rebuttable, these courts concluded that the question of reliance, or rather nonreliance, may be raised against a named plaintiff and may vitiate the typicality of that plaintiff's claims.[15]

Plaintiffs argue that, assuming nonreliance may constitute a defense, the three cited cases misconstrue the showing necessary to rebut the presumption of reliance. They contend that, to the extent these cases suggest that the presumption of reliance is rebutted by showing that the plaintiff relied on a newspaper article or a friend's advice, the cases are wrong. They rely heavily on *Panzirer v. Wolf, supra,* which held that reliance on a newspaper article does not preclude reliance on the integrity of the market, but merely inserts another link in chain of reliance: the reader relies on the writer who relies on the market.[16]

Plaintiffs, however, confuse the showing necessary to rebut the presumption of reliance on the merits and the showing necessary to raise an arguable defense of nonreliance to vitiate typicality.[17] *See Panzirer v.*

14. The only portion of this reasoning that has been called into question by the decision in *Panzirer v. Wolf, supra,* is the language suggesting that a plaintiff's claim may be defeated by showing "primary" reliance on something other than the market's integrity. According to the Second Circuit (663 F.2d at 367):

 If plaintiff can link her injury to defendant's fraud by showing the fraud was a "substantial" or "significant contributing cause," plaintiff has shown sufficient reliance to support her 10b–5 claim.

15. Some courts have determined that the issue of reliance is not a "unique" defense. See *Hochschuler v. G.D. Searle & Co.,* 82 F.R.D. 339, 343 (N.D.Ill.1978) ("issue of reliance . . . is indisputedly applicable to the entire class membership"); and *Hurwitz v. R.B. Jones Corp.* 76 F.R.D. 149, 158 (W.D.Mo.1977) ("*If* [reliance] is an issue as defendants contend, it is one that applies to each class member.") This conclusion, however, seems to ignore the effect that the presumption of reliance has on the defendant's burden. As the court noted in *Blackie v. Barrack,* 524 F.2d 891, 906 n. 22 at 907 (9th Cir.1975), *cert. denied.* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), in most transactions on the open market, a defendant will be unable to prove that a particular plaintiff "was indif-

ferent to a material fraud." Thus, in a fraud-on-the-market case, the lack of reliance is not an issue for the majority of the class. Accordingly, where a defendant can show that lack of reliance is an issue with respect to a named plaintiff, the court should consider this a "unique defense" and proceed to determine whether, under *Koos,* it renders that plaintiff's claim atypical.

16. Plaintiffs also rely on the seminal case of *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). But that case analyzed the presumption of reliance from the point of view of predominance not typicality. Moreover, it did not foreclose, as plaintiffs assert it did, the argument that the presumption of reliance may be rebutted by showing that the individual did not rely on the market's integrity.

17. For this reason the court is unpersuaded by the opinion in *Abrams v. Johns-Manville Corp.,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98, 348, at 92, 157–58 (S.D.N.Y. November 10, 1981), because that court did not discuss the differences between the two showings. See generally *Hurwitz v. R.B. Jones Corp.,* 76 F.R.D. 149, 157 n. 3 (W.D.Mo.1977), for cases

*Wolf,* 663 F.2d at 368 n. 4; *Kline v. Wolf,* 88 F.R.D. 696, 700 (S.D.N.Y.1981); *Greenspan v. Brassler,* 78 F.R.D. 130, 132 (S.D.N.Y.1978) and discussion, *supra,* at pp. 336–338. *See also Lewis v. Johnson,* 78 CV 2488, slip op. at 3 (E.D.N.Y. March 19, 1982), where the court highlighted the difference between a challenge to the plaintiff's reliance on a motion for summary judgment and such a challenge in the context of a motion for class certification.[18]

■ As plaintiffs argue, on a motion for class certification, this court may not pass on the merits of any substantive issues. But this does not preclude the court from determining, as it must under the rationale of *Koos,* whether defendant can *arguably* challenge, as to the named plaintiffs, the presumption that they relied on the market's integrity. Under *Koos,* all defendant must do to establish the atypicality of the named plaintiffs' claims is show that there is an arguable defense against them that is inapplicable to the remainder of the class and that threatens to become a primary issue in the litigation. The court therefore turns to an examination of the defenses asserted against McNichols and Singer in light of this standard.

*Frank McNichols*

■ McNichols filed his original complaint against Loeb Rhoades on March 14, 1978. The original class definition included all those who had purchased Olympia stock between August, 1975, and March 13, 1977. The gist of this complaint was one of fraud premised on misrepresentations concerning possible takeovers, future price rises due to the covering of short positions, and the true value of Olympia and its marketability, and on omissions such as the failure to disclose the reasons for Bernhardt's termination and Loeb Rhoades' position as a market maker for Olympia. On January 14, 1981, McNichols filed a Second Amended Complaint which incorporated for the first time the current class definition and a theory of liability based on "fraud on the market."[19]

McNichols' account representative at Loeb Rhoades during the class period was Ralph D. Lynch. McNichols has testified that he spoke to Lynch about Olympia "just about every day." (McNichols Dep. I at 41–42). In addition to their business relationship, the two lived near each other and saw each other socially. In February, 1977, they went on a gambling junket together to Las Vegas. In his answers to interrogatories, McNichols identified Lynch as the source of the alleged misrepresentations and nondisclosures for which he seeks to hold Loeb Rhoades liable, and as his sole source of investment advice.[20] McNichols never spoke to or discussed Olympia with Jack Bernhardt and there is no allegation that Lynch was merely relaying information or misinformation received from Bernhardt.

An analysis of the pleadings and the plaintiffs' briefs reveals that McNichols is attempting to hold Loeb Rhoades liable on two separate grounds. He alleges that Lynch, in the course of conversations between him and McNichols, made a series of oral misrepresentations regarding Olympia and also failed to disclose certain material facts. This claim is clearly individual to McNichols alone. But McNichols also alleg-

---

discussing the difference between an inquiry into the merits and an inquiry under Rule 23.

**18.** The *Lewis* court stated:

The deposition testimony before the Court presents certain admissions by plaintiffs concerning the bases of their *individual* decisions to purchase the stock in question. Certain of these admissions preclude the possibility of plaintiffs' direct reliance on the alleged misrepresentative statements. The admitted weakness of their reliance was critical to the finding of plaintiffs' atypicality; however, causation in fact remains an issue to be proved or disproved at trial. (emphasis in original)

**19.** In November, 1981, McNichols moved to consolidate his case with that of Louis Singer and to file a Third Amended Complaint, which this court subsequently allowed.

**20.** Loeb Rhoades contends that Lynch to this day remains McNichols' representative at Shearson, Loeb Rhoades, and questions whether McNichols would continue to use the services of someone whom he truly believed had defrauded him.

es a course of conduct on the part of Loeb Rhoades that manipulated the market by inflating the price of Olympia, the fraud on the market claim.

To the extent that McNichols' claims against Loeb Rhoades are premised on Lynch's oral statements to McNichols, his claims and the defenses to which he is subject are atypical of the class. It would appear that the majority of the class never dealt directly with Loeb Rhoades, much less with Lynch personally. Moreover, the presumption of reliance applicable to the fraud-on-the-market claim does not come into play where McNichols is basing liability on affirmative misrepresentations made to him personally.[21] But plaintiffs advance two arguments why the concededly individual issues involving McNichols should not affect the certification of the class.

Initially, they argue that just because McNichols has an "additional" claim based on individual misrepresentations, besides the class claim based on a fraud-on-the-market, this does not prevent him from adequately representing the class claim.[22] The court concludes, however, that if the individual misrepresentation claim is "in addition to" the fraud on the market claim, it has no place in this litigation. *See Wolgin v. Magic Marker Corp.*, 82 F.R.D. 168 (E.D. Pa.1979); *In re Scientific Control Corp. Securities Litigation,* 71 F.R.D. 491 (S.D.N.Y. 1976).

In *Wolgin,* the plaintiffs asserted a cause of action very similar to that put forward here. They alleged that over a period of two years the defendants had artificially inflated the price of Magic Marker stock by creating the appearance of active public trading. Defendants allegedly did this in part by tying up large blocks of shares in accounts that they controlled, thereby reducing the "float" (the volume of shares available for public trading) and heightening the impact of any purchase on the market price of the remaining shares.

The defendants challenged two of the named plaintiffs as having atypical claims because they purchased stock based on unique oral representations made to them by one of the defendants. The court analyzed the record before it and found:

> It does appear that the Altcheks *could* attempt to establish liability based on defendant Teitelbaum's oral representations, rather than basing their claim on the wide-ranging price manipulation alleged in the complaint. But the several memoranda filed in connection with this motion make it abundantly clear that the Altcheks have chosen the latter approach. Thus, their claim will stand or fall based on proof of the alleged conspiracy.

82 F.R.D. at 172 (emphasis in original).

The *Wolgin* defendants also argued that common questions did not predominate because a substantial number of putative class members, due to their individual dealings with one or more of the defendants, could allege more specific claims than the price manipulation alleged by the class. The court rejected this argument, reasoning that:

> Assuming *arguendo* that a substantial number of class members *could* assert specific claims based on their individual dealings with various defendants, it does not follow ... that they would have any right to do so. Individual claims of this sort [such as claims of unauthorized purchases by defendant brokers for their customers' accounts], as defendants themselves point out, "would have no relationship to any claim of the other class members." ... Should a class member with such a claim decide, after receiving notice of this action, to preserve his individual claim rather than to cast his lot with the class as it presses its price-manipulation claim, he is free to opt out of the class.... And defendants are mistaken in their assumption that a class member who chose *not* to opt out could present his individual claim in this action.

82 F.R.D. at 177 (emphasis in original).

To similar effect, the plaintiffs in *Scientific Control* took the position that the

21. See pp. 341–343, *infra.*

22. Plaintiffs' Supplemental Memo in Support at 11.

fraud upon which their class action was based did not depend upon any affirmative misrepresentations by defendants. The court noted that:

> In accord with these contentions, plaintiffs have offered to include in their notice to absent class members the admonition that this suit does not encompass individual affirmative misrepresentations and that if a class member wishes to prosecute a claim premised on affirmative misrepresentations, he may elect not to be included in the class.

71 F.R.D. at 510.

Unlike the plaintiffs in *Wolgin* and *Scientific Control,* it is abundantly clear to this court that McNichols has no intention of abandoning his claims of liability based on Lynch's statements. Rather, he intends to prosecute both his individual claims and the "class" claim of fraud on the market. *See, e.g.,* Plaintiffs' Supplemental Memo in Support at 3:

> In his complaint, deposition testimony and answers to interrogatories, McNichols has alleged that Loeb Rhoades' liability rests on two related factual bases—first, Loeb Rhoades' illegal course of conduct ... which artificially inflated the price of Olympia stock, and second, misrepresentations made to McNichols by Loeb Rhoades broker Ralph Lynch.

His intention to prosecute both claims undermines his ability to adequately represent the class.

Looking at the problem from the perspective of the evidence necessary to prove the claims, the burden of establishing the misrepresentation claim is less onerous than the burden of showing the existence of a wide-ranging, complicated fraud on the market. As this litigation progresses, McNichols may find himself tempted to slight the price manipulation claim, especially if he comes to believe that his chances of prevailing on the misrepresentation claim are good.[23]

Conversely, it appears to the court that the class claim of a fraud on the market would survive even if McNichols did not prevail on his individual claim of misrepresentation. This circumstance leads the court to wonder exactly how it is in the interests of the class to litigate whether Lynch lied to McNichols. In short, the court rejects plaintiffs' argument that "the additional allegations that McNichols was defrauded by the oral misrepresentations made by his broker do not impair his ability to prosecute on behalf of the class the claim that Loeb Rhoades perpetrated a fraud on the market."[24] The addition of McNichols' individual claim makes him and his claims atypical, which in turn negates the adequacy of his representation of the class.[25]

---

**23.** The court, of course, makes no determination as to the relative merits of either claim. At this juncture, it is not possible as well as being highly inappropriate. Nor is the court engaging in idle speculation. The court must attempt to determine whether there are conflicts lurking between McNichols and the class he seeks to represent and such a determination necessarily involves some element of conjecture.

**24.** Plaintiffs' Supplemental Memo in Support at 11.

**25.** This conclusion is reinforced by the Supreme Court's Analysis in *General Telephone Co. v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). In that case, the named plaintiff brought an action alleging that he had been denied a promotion because of his national origin. The district court certified a class that included both employees who were denied promotion and applicants who were denied employment, all because of their national origin.

In ruling that certification was improper, the Court reasoned that (102 S.Ct. at 2371):

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For respondent to bridge that gap, he must prove much more than the validity of his own claim. Even though evidence that he was passed over for promotion when several less deserving whites were advanced may support the conclusion that respondent was denied the promotion because of his national origin, such evidence would not necessarily justify the additional inferences (1) that this discriminatory treatment is typical of petitioner's

Plaintiffs, however, have another, alternate argument to allow McNichols to litigate both claims. They contend that Lynch's individual misrepresentations to McNichols were "simply part of" the common course of conduct designed to drive up the price of Olympia.[26] According to this characterization of the litigation, all class members would share an interest in proving that Lynch lied to McNichols in order to induce him to purchase Olympia because this would establish another "piece" of the overall scheme to inflate the stock's price.[27] This argument, however, fails to solve the problem.

Accepting, for the moment, plaintiffs' scenario in which Loeb Rhoades used a number of devices to drive up the price of Olympia, Loeb Rhoades will certainly be entitled to attack each of the alleged devices individually. One of the devices plaintiffs have accused Loeb Rhoades of using is inducing McNichols to purchase stock through material misrepresentations. It therefore follows that Loeb Rhoades is entitled to attempt to show that the alleged misrepresentations did not induce McNichols to purchase any stock. Thus, even if

Lynch's statements to McNichols are but a "part" of a larger scheme, the statements and their causal relation to any losses suffered by McNichols must be established by individual proof.[28] This individualized inquiry into McNichols' transactions, which would not be required with the great majority of the class members' transactions, renders his claims—both his individual claim and his class claim—atypical.

■ Another reason for finding that McNichols is an atypical plaintiff and for questioning his adequacy as a representative is the circumstance that he is named as a counterdefendant. McNichols argues that the counterclaims against him are without merit, but that remains to be proven. As long as he is "at risk" as a counterdefendant, his energies will be divided between establishing Loeb Rhoades' liability and his own nonculpability. This cannot but interfere with his representation of the class. *Cf. Alpert v. U.S. Industries, Inc.,* 59 F.R.D. 491, 17 Fed.R.Serv.2d 696, 698 (C.D. Cal.1973) (Truth in Lending Act case; presence of counterclaims renders action inappropriate for class treatment); *and Minersville Coal Co. v. Anthracite Export Associa-*

---

promotion practices, (2) that petitioner's promotion practices are motivated by a policy of ethnic discrimination that pervades petitioner's Irving division, or (3) that this policy of ethnic discrimination is reflected in petitioner's other employment practices, such as hiring, in the same way it is manifested in the promotion practices. These additional inferences demonstrate the tenuous character of any presumption that the class claims are "fairly encompassed" within respondent's claim.
This reasoning is equally applicable here. There is a similar "gap" between McNichols' claim of individual misrepresentation and the class claim of fraud-on-the-market, so that any presumption that the class claim is "fairly encompassed" within McNichols' individual claim is likewise of a "tenuous character."

**26.** Plaintiffs' Reply Memo in Support at 23.

**27.** The alleged scheme or course of conduct includes a variety of other "pieces" or facets, some of which are as individualized as the claim of misrepresentation to McNichols, such as the claim that Loeb Rhoades allowed certain customers to purchase stock with insufficient checks. Third Amended Complaint, ¶ 18(e). This latter claim would require as to each dis-

puted transaction proof of the identity of the customer, proof that their tendered checks were N.S.F. at the time, proof that this was deliberate, and proof that Loeb Rhoades knew this. Some of the other "pieces" of the alleged scheme, by contrast, are susceptible to common proof, such as the claim that Loeb Rhoades fraudulently recorded large lot purchases and sales to create the appearance of high volume trading. Third Amended Complaint, ¶ 18(e).

**28.** Individual proof is necessary because the misrepresentations allegedly made to McNichols are not mere reiterations of a standardized public misrepresentation. *Cf. Sargent v. Genesco, Inc.,* 75 F.R.D. 79, 85 (M.D.Fla.1977) (in the context of a predominance analysis, the court found that oral representations were simple, undetailed, and mere reiteration of the information contained in annual reports and various prospectuses); *with In re Control Corporation Securities Litigation,* 71 F.R.D. 491, 504, 510 (S.D.N.Y.1976) (again in the context of a predominance analysis, court found that existence of a series of separate oral conversations argued against certification because they were not merely cumulative).

*tion,* 55 F.R.D. 426, 429 (M.D.Pa.1971) (where ten named plaintiffs signed releases including an indemnification provision, court found them "possibly" inadequate representatives, even though they alleged the releases were obtained by fraud.)

Finally, the court is entitled to give some weight to the memorandum filed by thirteen named plaintiffs in one of the other consolidated cases, *Lindstrom, et al. v. Loeb Rhoades,* 77 C 3820. The *Lindstrom* plaintiffs oppose McNichols' motion for class certification on the grounds that he cannot adequately represent the interests of the class. They argue that his role as counter-defendant renders his interests at odds with those of other plaintiffs, particularly those who had no contacts with Loeb Rhoades during the trading period.

■ The court may properly consider the views of putative class members on the question whether a self-proclaimed class representative can adequately protect their interests. *See Shulman v. Ritzenberg,* 47 F.R.D. 202, 207–08 (D.D.C.1969). In that case, the court considered affidavits from putative class members challenging the adequacy of the named plaintiff's representation and denied certification. *Cf. Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 914 (9th Cir.1964), where the court stated: "No investor . . . is unfavorable to maintenance of the [class] actions"; *Kesler v. Hynes & Howes Real Estate, Inc.,* 66 F.R.D. 43, 50 (S.D.Iowa 1975) ("no evidence that any class member has indicated a displeasure with the representative parties"), and *Tober v. Charnita, Inc.,* 58 F.R.D. 74, 81 (M.D.Pa.1973) (same). At the very least, the *Lindstrom* plaintiffs' objection to McNichols as class representative argues against his ability to adequately represent *all* of the other class members.

For all of the above reasons, the court concludes that McNichols will not adequately represent the interests of the class. The court therefore turns to an examination of Singer as a putative class representative.

*Louis Singer*

■ In this litigation, Louis Singer stands in the shoes of TSCo, a professional market maker. A market maker in a particular security, as defined by the NASD manual, is a dealer who either regularly publishes bid and ask quotations in an inter-dealer system or furnishes such quotations on request, and who is "ready, willing, and able" to trade reasonable quantities of the security in which he is making a market to other dealers at his quoted prices. As explained by Frederic Rittereiser, the manager of the over-the-counter trading department at TSCo at the time, TSCo was in the business of putting buyers and sellers together, acting as a conduit between the two, and getting its profit from the "spread," the difference between the bid and asked price. (Dep. at 31–33).

A market maker such as TSCo is not an investor.[29] It would therefore appear that the issues of both reliance and materiality would be different for a market maker; he would rely on different factors than an investor would and facts that would be material to an investor's decision might not matter to him. But plaintiffs argue that a market maker relies on price movement and volume of trading in its operations. They assert that Loeb Rhoades manipulated both through its course of conduct, thereby causing injury to TSCo, and that as a result TSCo's claim against Loeb Rhoades is sufficiently similar to the claims of the class, most of whom are presumably investors rather than market makers, to satisfy the requirements of Rule 23(a)(3) and (4).

Loeb Rhoades contends that there is a substantial question whether TSCo relied on price, that this is an issue unique to TSCo as a market maker, and therefore that TSCo's claim is atypical. Additionally, there is some suggestion in the record that TSCo was aware that the volume of trading in Olympia was low, despite the alleged manipulation of trading in Olympia to give the appearance of high volume.

---

**29.** *See, e.g.,* Rittereiser Dep. at 31: Foster Marshall is a different type of firm. It invests in stocks for their clients. TSCo was not in that business.

The record before the court shows that Rittereiser decided that TSCo would become a market maker for Olympia on January 11, 1977.[30] From January 11 until March 7, 1977, TSCo never assumed a major position in Olympia, maintaining an average daily overnight position of 316 shares. On March 7, the day after the negative *Barron's* article when the market price of Olympia dropped 10 or 11 points, TSCo's position increased from 731 shares at the beginning of the day to almost 12,000 shares by the end.[31] TSCo's loss for this one day of trading amounted to $25,189, but plaintiffs argue that this was "not very substantial" to TSCo because of its extensive assets.[32] Over the next three days the market in Olympia rebounded and stabilized. On Tuesday and Wednesday, TSCo's market making actually resulted in small profits, while on Thursday it had "a relatively small loss" of approximately $9,000.[33]

According to plaintiffs, "Friday, March 11, 1977, was the most significant day for Singer with respect to its Olympia trading." [34] On that day, the price of Olympia fell another 16 points, TSCo's overnight position increased to approximately 33,500 shares, and it suffered a loss from the day's trading of approximately $322,000. On this day, for the first time, TSCo checked into Olympia to see if there was anything fundamentally wrong with the company.[35] On the next day of trading, March 14, 1977, TSCo's position in Olympia continued to increase to an overnight position of some 52,000 shares. On that day, the SEC suspended trading in Olympia. From the resumption of trading until the close of the class period, TSCo continued as a market maker for Olympia but because there was no demand side in the Olympia market, it suffered further losses.

The preceding summary shows that TSCo bought Olympia in substantial quantities in a declining market. Plaintiffs have argued at length that this conduct was reasonable in light of, and in fact mandated by, TSCo's role as a market maker. Nevertheless, the fact remains that TSCo's conduct places it in a somewhat anomalous position. TSCo's losses stem from the fact that it was a market maker, not from any investment decision going sour. The issue of causation thus involves the question whether the fraudulent conduct attributed to Loeb Rhoades had any relevance to TSCo's decision to become and continue as a market maker.

Loeb Rhoades challenges plaintiffs' argument that market price was material to TSCo and that it relied on market price. On this question, the deposition testimony is in conflict. There is some indication in Singer's deposition testimony that price was a factor in the decision whether to act as market maker (see pp. 43, 73, 138–39) while Rittereiser in his deposition denied that price was a factor (see pp. 178–79). Rittereiser testified that a market maker's "ideal" security would be one that traded in volume but did not move up or down in price.[36]

Plaintiffs also argue that volume of trade is material to a market maker and that TSCo relied on the appearance of high vol-

---

**30.** Prior to that date, the only transaction by TSCo in Olympia was the purchase on October 12, 1976, of 500 shares at $44.50 from a correspondent broker-dealer in Seattle and the sale of the same number of shares at the same price to the same broker-dealer on October 21, 1976.

**31.** See Table I to Defendant's Memo in Opposition to Singer's Motion for Class Certification.

**32.** Plaintiffs' Reply Memo in Support of Singer's Motion for Class Certification at 14.

**33.** *Id.* at 16.

**34.** *Id.*

**35.** Rittereiser Dep. at 115.

**36.** Singer and Rittereiser disagreed on other matters. Singer stated that his "major reason" for remaining a market maker in Olympia after the resumption of trading on March 25, 1977, was to "dollar average down"—to reduce the average price of the shares held by increasing the number of shares when the price dropped. (Dep. at 191.) Conversely, Rittereiser testified that "dollar averaging" is an investor's tool and that it is irrelevant to a market maker. (Dep. at 214–15.) The possibility that TSCo. may have "averaged down" constitutes another arguable defense. *See Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y.1981).

ume trading in Olympia, which was deceptive due to Loeb Rhoades' manipulation of the market. Singer and Rittereiser both agree that volume of trading was an important factor in the decision to become a market maker in any particular stock. And plaintiffs assert that apart from the upward price movement from $20 in June, 1975, to $51 bid, $52 asked on January 11, 1977,[37] the only fact that TSCo knew about Olympia when it decided to become a market maker was that there apparently was substantial interest in buying and selling the stock.

In Rittereiser's deposition, however, while discussing his decision to make a market in Olympia, he testified (at p. 38):

Q. Did you ever make an observation with respect to how many shares of Olympia Brewing Company were outstanding?

A. I did at the time, but I don't recall what it was.

Q. Do you recall whether you had an impression or not of whether Olympia Brewing Company was a thinly traded stock?

A. It was thin.

Later in the deposition, after establishing that there was a one dollar spread between TSCo's bid and ask quotations on March 7, 1977, Rittereiser further testified (at pp. 43–44):

Q. In general, sir, was a dollar spread by an individual marketmaker in a security an indication that there was volatile price movement in that security?

A. As I stated before, that does not necessarily mean that.

Q. If we add the extra factor, sir, that we're talking about a thinly traded security, does that, based on your years of experience, suggest to you that a dollar spread by an individual marketmaker in a thinly traded security would be indicative of volatile price movement in that security?

A. Not necessarily.

Q. What else would you need to know, sir?

A. What the spread indicates to me, individual marketmaker spread, indicates to me on every stock, forget about Olympia Brewing, is that the trading float is relatively thin. That's all it means to me.

Q. Does the fact that the trading float is relatively thin suggest to you any liquidity problems with respect to that stock, in this instance being Olympia Brewing Company?

A. Yes, it could pose liquidity problems and liquidity problems go for both the buy side and the sell side.

On the basis of this testimony, there is a question whether Rittereiser's expertise as a market maker, which is attributable to TSCo, belies the argument that TSCo relied on the appearance of heavy volume trading in Olympia.

The court does not pass on the merits of these issues. But the existence of an arguable defense based on TSCo's lack of reliance on the fraud alleged in plaintiffs' complaint, or its lack of materiality, due to TSCo's role as a market maker, is a unique defense that will require a significant amount of time and energy to resolve. This makes TSCo an atypical plaintiff in this fraud-on-the-market case.[38]

37. And as noted earlier, Rittereiser denied the importance of this factor.

38. The court emphasizes that it does *not* hold that a market maker, as a matter of law and solely by virtue of its role as market maker, can never adequately represent the interests of a class composed of investors. Plaintiffs' citation to cases such as *Hochschuler v. G.D. Searle & Co.,* 82 F.R.D. 339, (N.D.Ill.1978), and *Leist v. Tamco Enterprises, Inc.,* 80 Civ. 4439–CtB S.D.N.Y. March 16, 1982), is of no avail here. In *Hochschuler,* the court held that the seller of a "put" option was not an atypical plaintiff because a "put option seller must prove the same case as the common stock purchaser would." *Id.* at 347. In *Leist,* the court rejected the argument that a professional investor's sophistication rendered him atypical. What these cases show is that a court must examine the facts and issues in each case to determine whether a plaintiff's special role, knowledge, or expertise makes his claims atypical in light of the allegations in that particular

CONCLUSION

In this Circuit, a plaintiff who is subject to an arguable defense that is not generally applicable to the class as a whole and that threatens to become a major issue in the litigation is atypical and inadequate as a class representative. McNichols is one such plaintiff due to his asserting claims based on oral representations made to him alone. His individual claims have raised questions of his reliance, proper in a case based on misrepresentations, that have no place in a class action based on a fraud on the market. Singer is also an atypical plaintiff, due to the causation problems involving reliance and materiality that result from TSCo's role as a market maker in this case.

As neither named plaintiff satisfies the prerequisites of Rule 23(a)(3) and (4), this court cannot certify a class and need not reach the other prerequisites under Rule 23(a) or (b)(3). Accordingly, the motion for class certification is denied.

case. *Cf. Simer v. Rios,* 661 F.2d 655, 672 (7th Cir.1981), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982), (predominance analysis requires inquiry into substantive elements of plaintiff's cause of action and proof necessary to establish each element).

The court does find that, on the basis of the record before it, there is an arguable defense regarding a lack of causation between the fraud alleged in this case—the inflated price and the deceptive appearance of high volume trading—and TSCo's losses when it bought in a declining market, which arises from TSCo's atypical role in this litigation as a market maker.